UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE: HIGH PRESSURE
LAMINATES ANTITRUST
LITIGATION.



00-MD-1368 (CLB)

*Memorandum and Order*

------------------------------------------------------------x

Brieant, J.

By motion filed on March 7, 2005, heard and fully submitted on April 19, 2005, the sole remaining Defendant in this antitrust class action, Wilsonart International, Inc. ("Wilsonart"), moves under Fed. R. Civ. P. 23 to decertify the class as to damages, or in the alternative, to bifurcate the trial as to liability and damages. Opposition papers to this motion were received on March 30, 2005.

Familiarity by the reader with the allegations and claimed facts of this case will be assumed. Stated simply, this is a horizontal price fixing case involving high pressure laminates ("HPL"). Wilsonart consented to class certification, and the Court entered its Order granting class certification on June 17, 2003. Wilsonart now argues that continued class certification as to damages is improper. In its memoranda and at oral argument, Wilsonart argued that it sought "one trial before a single jury on issues of liability and damages. And we want that without the threat of collateral attack on 'due process' grounds by absent class members, assuming Wilsonart prevails." *April 19, 2005 Tr. at 2*. This current motion is based upon alleged problems arising from the Plaintiffs' expert economist's damage models. Plaintiffs' expert economist, Dr. John Beyer, has calculated overcharges using three separate damage models. These are: (1) a "cost/price" ratio, in which he compares the actual ratio of price to cost before the Class

-1-

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

Copies mailed / handed / faxed to counsel 04/27/05

period to the ratio during the class period; (2) a "linear regression" model that econometrically calculated an overcharge after controlling for cost, demand, imports, channel and grade of HPL. Finally, Dr. Beyer presented a "benchmark" model that compared the prevailing price in the Greater Miami region[1] to the rest of the United States during the class period. Dr. Beyer calculated a single average overcharge of approximately 5.8 cents per square foot which he claims takes into account price changes over time in the various mixes of grades of HPL purchased by the class members during the class period. "It is in his use of this average overcharge that Wilsonart sees the problem with Dr. Beyer's approach, even when he differentiates between channels and grades." *Tr. at 10*.

Wilsonart's main argument is that class members located in the Greater Miami region have an irreconcilable conflict with class members in other locations. "That's right, your Honor. But I would point out at this stage, we don't have adequate notice or adequate representation of those Miami class members. . .That's the principal and, I think, primary problem with what has occurred here." *Tr. at 15*. Dr. Beyer's report of June 12, 2003 stated that "the HPL market in Greater Miami was more price competitive (by the defendant manufacturers' own admission) than the rest of the U.S. This increased competition is largely attributable to the substantially larger presence of imported HPL in Greater Miami than in the rest of the country." In the Greater Miami region, "HPL prices grew at a slower rate than HPL prices in the rest of the U.S." This expert report states clearly that the Greater Miami class members, if injured at all by an alleged

---

[1] It is a matter of dispute between the parties what exactly the "Greater Miami region" consists of. The Plaintiffs claim that it is only those zip codes that comprise the city of Miami, while the Defendant argues that it is all of Florida except for the Panhandle.

conspiracy, were injured in a different or lesser manner than the rest of the class.

In Dr. Beyer's Class Certification Report, *see Def.'s Ex. 35 at 2*, he states that "Plaintiffs in this litigation have asked me to determine whether the defendants' alleged actions and agreements to coordinate and increase prices of [HPL] would have impacted all members of the proposed class. . .I have also been asked to determine whether there are feasible approaches for assessing damages on a class-wide basis, and if so, to identify and describe them." This initial report did not identify the Greater Miami region as a competitive benchmark or as the basis for a potential damage model.

Dr. Beyer's next expert witness report, dated June 12, 2003, states his belief that all class members were impacted by a price-fixing conspiracy:

> Several factors lead me to believe that market-wide perturbations in price would affect all purchasers of HPL in like fashion. These factors include the commodity nature of HPL, the fact that the same HPL supply and demand factors affect all the defendant manufacturers, and the substantial geographic overlap of the defendant HPL manufacturers' operations and distribution channels. Further, prices of the most commonly purchased grades of HPL grew similarly over time, despite differences in how the different grades are generally used by purchasers.

While Dr. Beyer stated that "[I]mports comprise a relatively small share of the U.S. market for HPL," evidence exists that "imports play a more significant role in the greater Miami, Florida area." *See Def.'s Ex. 37 at 21-22.* "[I]mports to Florida were anywhere between 17 and 32 percent of total U.S. imports, depending on the year." *Id. at 22.*

The Greater Miami damage model was disclosed in Dr. Beyer's June 12, 2003 expert

witness report. On page 36, Dr. Beyer stated that "[T]he final method by which I show that the defendant manufacturers' alleged joint conduct impacted prices paid by their customers involves comparing U.S. prices of HPL to those in a more competitive market, namely the Greater Miami area...[due largely to] the relatively large share of imports." Dr. Beyer states further, "That these relatively large levels of imported HPL made the Greater Miami market different from other markets is shown by the fact that [Defendant]...maintained separate rebate schedules specifically for the Greater Miami area....." *see id. at 38*, and that "ample empirical evidence [exists] that throughout the Class Period HPL prices in Greater Miami increased at a slower rate than did HPL prices in the rest of the U.S...." *id. at 39*. This slower rate was due to "the more competitive nature of the Greater Miami market as a result of the higher prevalence of imported HPL." *Id. at 40*.[2]

Dr. Beyer's third expert witness report, submitted on November 14, 2003, again stated that the Greater Miami region was more competitive than the rest of the United States. "Given the differences in the competitive environment in Greater Miami relative to the rest of the U.S., HPL prices in Greater Miami serve as a competitive benchmark with which to determine whether HPL prices in the rest of the United States are supra-competitive." *See Def.'s Ex. 43 at 48*. Dr. Beyer considered the price difference between Greater Miami and the rest of the country as "further evidence of the impact of the alleged conspiracy." This assertion would presume that prices in the rest of the country would have been the same or similar to the Greater Miami region

---

[2]This June 12, 2003 expert witness report belies the Defendant's assertion that it was unaware of the Greater Miami model, and the unique nature of the Greater Miami region, before February 4, 2005, and before it consented to this Court's Order of June 17, 2003.

in the absence of an alleged conspiracy. This theory ignores Dr. Beyer's statements that the super-competitive nature of Greater Miami was due to the unusually high levels of imports. Presumably the market conditions in Greater Miami would have given that region a competitive advantage even in the absence of any conspiracy. That prices were lower in Greater Miami may not indicate the effects of a conspiracy as much as unusual market conditions within Greater Miami. Clearly Dr. Beyer viewed the market conditions in Greater Miami as different from the rest of the country, and demonstrates that a single nationwide overcharge calculation might not be proper.

Dr. Beyer's final expert witness report on damages was submitted on November 8, 2004. All three damage models are explained within this last report. The Greater Miami model, and the super-competitive nature of the Greater Miami region, was again stated.

In Dr. Beyer's deposition, taken on February 4, 2005, he stated that:

> [T]hat [imports into the Greater Miami region] seemed to me to be - - to be the catalyst that caused the price competition to occur in the Greater Miami region. All I wanted to do was to test and see whether imports generally had some role, given that experience in Greater Miami, some role in price formation throughout the U.S. as a whole.

*Def.'s Ex. 51 at 21.* There was clear appreciation for the role imported HPL played in causing unusual market conditions within Greater Miami. Dr. Beyer stated further that while the precise amount of the overcharge suffered by Greater Miami purchasers was difficult to calculate because of a lack of empirical data, all class members, including those in the Greater Miami

region, paid higher prices for HPL than they otherwise would have:

> But what is clear - - and this is true for all the methodologies, including Greater Miami - - is that, number one, prices absent the alleged coordination would have been lower throughout the United States, and the indicated values of lower prices are reflected in my report.

*Id.* at 55. The prices in Greater Miami were allegedly higher, even with imported HPL, than they otherwise would have been had a price-fixing conspiracy not existed. "My judgment is that there probably would have been even more aggressive pricing in the Greater Miami area in the absence of this alleged collusion, but there is no empirical data to estimate what that pricing might have been." *Id. at 64-65*. Difficulties, due to the lack of empirical data regarding Greater Miami, existed in calculating damages for the class members within the Greater Miami region. One possible solution advanced by Dr. Beyer in dealing with this difficulty was to exclude the Greater Miami purchasers from the class:

> A. If anything, from what I've seen, the impact of that would be to raise the overcharge by excluding it, but a more direct approach, which is excluding the quantity of HPL sold by the defendants in - - in the Greater Miami area, which is measureable and it's in one of the tables in my report, would be excluded from the calculation of the dollar amount of damages.
>
> Q. And do you think that would be a accurate way to measure damages in this case, would be to exclude the Miami square footage from your regression model?
>
> A. You know, I - - that's really an issue that's beyond my role as an economist, because it has to do with someone deciding whether the Miami purchasers remain in the class, are excluded from the class. I don't make those determinations.

*Id. at 69-70*. While Dr. Beyer was unwilling to offer an opinion unrelated to his expertise, he did state, on numerous occassions, that Greater Miami class members had been injured differently from other class members. It would be improper to award an average overcharge to such

dissimilarly situated purchasers. *See also id. at 71-72*:

> Q. Is it your judgment that the purchasers in Miami were as damaged by the coordination alleged in the plaintiffs' complaint as were the purchasers of HPL in the rest of the United States?
>
> A. I've already covered that in the first question that you asked me after the break. I believe that there - - there was an effect, damages, incurred by purchasers of HPL even in the Greater Miami region but that empirically I cannot measure that.
>
> Q. Do you believe that the effect is of the same magnitude as the effect on the rest of the United States?
>
> A. Probably not, but because I can't - - that's a judgment, but because I can't empirically test that, I don't know. *(Objections omitted)*.

"But the issue ultimately is going to be decided by somebody other than me. Purchasers of HPL in Greater Miami are in or out of the class, and that calculation [damage calculation for Greater Miami purchasers] then can be done in a very straightforward manner from the data that I and the results of the analysis that I've done." *Id. at 73;*

> That question [whether the same amount should be awarded to Greater Miami purchasers], I've said before, is not for me to answer. Are there different damages between 97 percent of the HPL sold in the U.S. and the HPL sold - - during the class period - - in Greater Miami? Probably so. But the question of award and application of the overcharge by the cost/price or the regression is not for me to determine. This is something that ultimately can be done by others depending on what those who - - who have more authority in this case to make that determination than me.

*Id. at 75; at 77-78.*

At oral argument, Plaintiffs stated that they now intend to use only the regression model:

> So instead of having three damage analysis in this case, we will have just one damage analysis. And that damage analysis will thereby eliminate, I respectfully submit, all [Defendant's] arguments. But this is called the "regression. . . It's

one damage model, one model."

*See Tr. at 16.* That the Plaintiffs now seek to present one model rather than three does not alleviate the potential prejudice that might result to Greater Miami class members when Dr. Beyer is cross-examined during trial about his Greater Miami damage model and his conclusion that the Greater Miami region is a "competitive benchmark" and has suffered less damage than the rest of the nation. Dr. Beyer did not state that the Greater Miami class members suffered no injury, but he did state that they were injured in a different, or lesser, manner than class members in other regions of the country. Limiting the damage models to just the regression model does not solve this problem, because Dr. Beyer opined that it may be appropriate to exclude the Greater Miami class members from the regression model. *See infra.* Class members within the Greater Miami region are entitled to argue that they have been injured in the same manner, and to the same extent, as the rest of the country.[3]

## Conclusion

To alleviate any prejudice to absent class members in the Greater Miami region, the Court concludes that it will (1) bifurcate this trial into separate liability and damage phases, and (2) form a subclass consisting of purchasers of HPL who reside within the Greater Miami region. The Court accepts Defendant's definition; all of Florida except the Panhandle which consists of:

---

[3]Defendant argues that the issue of whether Greater Miami is a "competitive market" would go to the issue of liability as well as damages. The Court need not consider this issue. For purposes of this motion, the Defendant is accepting Plaintiffs' assertion that some overcharge did affect the Greater Miami class members. *See Tr. at 15-16.* Assuming that a price-fixing conspiracy did affect Greater Miami, this issue before the Court would affect damages solely.

Leon County, Wakulla County, Jefferson County, Madison County, Taylor County, Dixie County, Lafayette County, Hamilton County, Jackson County, Calhoun County, Bay County, Gulf County, Franklin County, Liberty County, Gadsden County, Santa Rosa County, Okaloosa County, Walton County, Holmes County, Washington County and Escambia County. This subclass will have to be represented by independent counsel. These Greater Miami class members have a current class representative in Custom Laminates or its principal, who will have the opportunity to elect to represent the sub-class and appear as such representative with separate counsel within fifteen (15) days. Notice must be given to all putative subclass members as soon as possible thereafter. If the tentatively designated subclass representative declines or fails to act within the time permitted, notice must nonetheless be given, with an opportunity for some other representation. If a subclass representative is designated, members of the subclass shall be given notice and an opportunity to opt out within a reasonable time. In all other respects, the motion is denied.[4]

Settle an appropriate Order or Orders on five (5) days notice.

---

[4] The Court has considered the Defendant's other objections to continued class certification and concludes that they do not present the type of conflict that warrants further subclasses.

SO ORDERED.

Dated: White Plains, New York
April 27, 2005

_____
Charles L. Brieant, U.S.D.J.