UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
IN RE: HIGH PRESSURE LAMINATES
ANTITRUST LITIGATION

00 MDL 1368 (CLB)

***Memorandum and Order***

------------------------------------------------------x
Brieant, J.

Before this Court is Defendant Wilsonart's motion pursuant to Rule 50(a)(1) Fed.R.Civ.P. for judgment as a matter of law (Doc. 348), filed on April 28, 2006. Opposition papers by the lead Class Plaintiffs do not appear currently on the docket sheet, but the Court received a courtesy copy of these papers on May 12, 2006. Opposition papers were filed by the Florida Sub-Class Plaintiffs on May 9, 2006. The matter was fully submitted to the Court on May 12, 2006.

*Background/Facts:*

On April 10, 2006, the Court began a civil jury trial in this civil antitrust litigation. Familiarity with the facts, circumstances, and parties to this case on the part of the reader is assumed here. The Plaintiffs have rested, and this motion has been considered while the trial was in recess. Defendant Wilsonart contends, and the Plaintiffs deny, that the Plaintiffs have not (1) presented evidence that tends to exclude the possibility that Wilsonart acted independently in its own self-interest during the class period, and (2) that Plaintiffs have not introduced any evidence from which a reasonable jury can infer that it is more likely than not that a conspiracy or agreement to fix prices existed among the HPL manufacturers during the class period. For the

1

following reasons, Defendant's motion is denied.

Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). A court considering a request for judgment as a matter of law must "'consider the evidence in the light most favorable to the party against whom the motion was made and ...give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (*quoting Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)). "'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" *Id.* (*quoting Smith*, 861 F.2d at 367).

In the context of antitrust litigation, as stated by Our Court of Appeals in *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 113-114 (2d. Cir. 2005):

> A plaintiff's claim, under the ordinarily applicable standard, will not survive a defendant's motion for summary judgment [or judgment as a matter of law] ...where the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff on that claim]. In making this determination, all inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the [plaintiff]. In a case brought under Section 1 of the Sherman Act, however, the range of permissible inferences from ambiguous evidence is limited, because antitrust laws prohibit only contracts, combinations, or conspiracies -- and not independent parallel conduct -- that operate unreasonably to restrain trade. Although parallel conduct can be probative evidence bearing on the issue of whether there is an antitrust conspiracy, it may also, as the district court in the instant case pointed out, simply [be] the result of similar decisions by competitors who have the same information and the same basic economic interests. Accordingly, in a Section 1 case where there is no direct, smoking gun evidence, conduct as consistent with permissible competition as with illegal conspiracy does

2

not, standing alone, support an inference of antitrust conspiracy.

The relevant inquiry is whether the Plaintiffs have presented evidence over and above mere parallelism. This Court concludes that they have. Plaintiffs have shown the existence of additional circumstances, so-called "plus factors", which, when viewed in conjunction with the parallel price movement, can serve to allow the jury to find that the Plaintiffs have presented evidence that tends to exclude the possibility that Wilsonart acted independently, and that it is more likely than not that an agreement to fix prices existed.

*"Plus Factors":*

As stated by Our Court of Appeals in *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 253 (2d. Cir. 1987):

> Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as "plus" factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy. Such circumstances might include a common motive to conspire or a high level of interfirm communications. (Internal citations omitted).

Even such plus factors may not "necessarily lead to an inference of conspiracy," *Apex* at 254, making it "difficult to hold that the parallel acts 'tend to exclude the possibility' of independent action. *Id*. For example, "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Id*. This is not the case here. There is still considerable doubt, as supported by the

3

record and described below, as to whether Defendant's interpretation of the "plus factors" evidence presented is equally as plausible as Plaintiffs.

*I. Evidence of Parallel Acts That Were Against The Apparent Individual Economic Self-Interest of the Alleged Conspirators:*

Plaintiffs presented evidence from which a jury may infer that the parallel acts were "against the apparent individual economic self-interest of the alleged conspirators." *Modern Home Institute, Inc. v. Hartford Acci. & Indem. Co.*, 513 F.2d 102, 111 (2d. Cir. 1975). "Such a showing, if successful, might tend to exclude the possibility of independent parallel behavior." *Apex* at 253 *citing Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977), cert. denied, 434 U.S. 1086, 55 L. Ed. 2d 791, 98 S. Ct. 1280 (1978); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). *See generally* 6 P. Areeda, Antitrust Law paras. 1415, 1434, at 84-93, 213-21 (1986).

Plaintiffs' evidence supports an inference that Wilsonart was in possession of, and that it made no economic sense for Wilsonart to share, as it did, competitors' confidential information, such as Mr. Reeb's (Wilsonart) possession of Formica's 1989 cost data, and Mr. Reeb's facsimile transmission of this data to Mr. Ringler of Premark. *See* PX 226. Wilsonart notes that this cost data was five years-old when it was faxed to Ringler in April of 1994, and therefore would have been useless in any price fixing scheme. This presents a jury issue. If it was so dated and useless, why was it shared? Defendant's suggestion that this data was acquired only as a part of due diligence for a possible corporate acquisition is also for the trial jury. A likely

4

inference is that this information was considered useful on some level, to members of the HPL industry. The jury is ultimately free to agree with Defendants on this issue, but there are genuine disputed issues of fact.

*II. Evidence of a High Level of Inter-Corporation Communications:*

Our Court of Appeals has also held that "a high level of inter-corporation communications" is a recognized "plus factor." *See Twomley* at 114. Plaintiffs have introduced evidence from which a jury could infer that Wilsonart made pricing moves based on pricing information communicated or shared directly by a competitor. The evidence is as follows, as reflected on Plaintiffs' chart at Rausser Ex. 44:

- On October 20, 1993, a Wilsonart document mentions that "Formica is going up" and also references a pending Wilsonart increase (PX 152), which was later announced on October 26, 1993.

- A November 5, 1993 report to Bill DiGaetano of Wilsonart states that "both Formica and Nevamar have announced or are rumored to announce, a price increase similar to Wilsonart..." (PX 162).

- A November 15, 1993 memorandum from Donnie Lucas of Wilsonart notes that Formica and Pioneer are increasing prices at OEM accounts, noting the amount and effective dates of the increases prices (PX 174).

As reflected on Plaintiffs' chart at Rausser Ex. 46:

- On April 20, 1995, Mr. Stanton at IP notes in an internal report that Wilsonart is reportedly looking to raise its price in the summer.

- In mid-May, Mr. Pendy of Wilsonart, an employee recently hired from IP, was asked to call his former friends at IP to see if they had heard anything about whether Formica had raised its prices. Formica announced a price increase on May 30, 1995.

- On June 6, 1995, a sales representative of Wilsonart faxes Mr. DiGaetano

5

a memorandum, stating that "... both Formica & Pioneer have/will be announcing a .03/.04 PSF increase to Dist/OEM accounts for 7/1/95. Implementation date might be negotiable by 30 days" (PX 376).

As reflected on Plaintiffs' chart at Rausser Ex. 47:

- On April 18, 1996, Mr. Tees of Pioneer made note of a conversation he had with Mr. Reeb of Wilsonart (PX 534). Mr. Reeb testified that he did not recall the conversation, and that he thought that most of the subjects recorded in the memorandum were proper, though admitted that the discussion of times to improve margins was inappropriate. Mr. Reeb stated that he wished he had not discussed it.

- On May 4, 1996, Mr. Reeb and Mr. Maspero, both of Wilsonart, met with Mr. Stanton and Mr. Oakley, both of IP, on the floor of a trade show. Mr. Stanton reported this meeting in a memorandum that he forwarded to his law department (PX 555). It states that Reeb: "began to talk about the recent restructurings in the industry and now that all of the LBOs had been purchased by larger companies, he expected the new owners to impose greater responsibility on the operating managers. He then went on to tell me that if the competition did not act more responsibly, he was going to 'turn Lou loose to play the Wilsonart market share game, which is growing at 2% per year.' My only retort to that comment was 'everyone gets wet in a peeing contest.'"

As reflected on Plaintiffs' chart at Rausser Ex. 48:

- On February 11, 1997, Mr. Clement of Formica reports: "There are rumors of an HPL price increase in the U.S. We will know more by the end of the month."

There was also a July 1998 meeting between Reeb and Robert Muller, CEO of Panolam Industries, Inc. (which was in the process of acquiring Pioneer) in which Reeb said that if Muller entered the HPL market and caused "trouble in the business," Reeb would "squash him like a bug." 4/17/06 Tr. 237:5-238:23 (Muller).

Defendant Wilsonart contends that this evidence does not point to an adverse inference any more than it could a positive one: "[T]he evidence introduced during Plaintiff's case in chief

6

reveals that it is at least as likely, if not more likely, that pricing information was obtained as competitive intelligence through customers..." *Memorandum in Support of Defendant Wilsonart's Motion for Judgment as a Matter of Law* at p. 9. The Court disagrees. While some information might have been gathered through innocuous customer chatter, it cannot be seriously disputed that there is evidence of direct, deliberate inter-corporate communications, such as the conversation which took place at the trade show between Reeb, Stanton, and others, which Mr. Stanton characterized as "inappropriate," and the conversation between Mr. Tees of Pioneer and Mr. Reeb, where Mr. Reeb admitted that the discussion of times to improve margins was inappropriate. It is also more likely than not that Mr. Reeb's threat to "squash" interfering "bugs," if it were really made, leads to an inference of collusion. The Court has no opinion as to whether Reeb actually said this, and/or whether he actually had the power to crush "bugs." The Court cannot ignore these realities at this stage and conclude that it is as equally plausible that all inter-corporation communications were benign, although a jury may so find.

The Plaintiffs have also presented evidence that the HPL manufacturers used their membership, or association, with various trade groups in furtherance of their alleged scheme to set prices: Plaintiffs allege that various HPL manufacturers shared their information with, and paid the Construction Products Marketing Association ("CPMA") and National Electrical Manufacturers Association ("NEMA") to compile HPL industry studies on capacity, market share, etc. Plaintiffs contend that this information was then distributed to the HPL manufacturers, and that they in turn used it in their alleged price fixing scheme. Again, this inference seems more likely than not to be plausible, and therefore the jury must have to

7

opportunity to decide the issue.

As stated by Our Court of Appeals:

> A court deciding whether to grant summary judgment [or judgment as a matter of law] should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place. Evidence can take on added meaning when viewed in context with all the circumstances surrounding a dispute. Thus, while we must carefully determine what inferences reasonably may be drawn from each piece of evidence, we must make this determination in light of all of the evidence proffered... *Apex* at 254-255.

Here, considering all of the evidence presented, and for the reasons stated, the Court concludes that Plaintiffs have presented evidence that tends to exclude the possibility that Wilsonart acted independently at all times. Accordingly, the case must go the jury.

## **Conclusion**

For the foregoing reasons, Defendant's motion (Doc. No. 348) is denied.

SO ORDERED.

Dated: White Plains, New York
      May 15, 2006

                                                _/s/ Charles Brieant_____
                                                Charles L. Brieant, U.S.D.J.